**Leonard JEFFRIES, Plaintiff,**

v.

**Bernard HARLESTON, individually and in his official capacity as President of City College of New York, W. Ann Reynolds, individually and in her official capacity as Chancellor of City University of New York, James P. Murphy, Edith B. Everett, Herman Badillo, Sylvia Bloom, Gladys Carrion, Louis C. Cenci, Michael J. Del Guidice, Stanley Fink,**

William R. Howard, Harold M. Jacobs, Susan Moore Mouner, Calvin O. Pressley, and Thomas Tam, individually and in their official capacities as Trustees of City University of New York, Defendants.

No. 92 Civ. 4180 (KC).

United States District Court, S.D. New York.

Aug. 4, 1993.

Joseph Fleming, New York City, for plaintiff.

Kathy–Ann Whipple, Clement J. Colucci, Asst. Atty. Gens., New York City, for defendants.

## OPINION AND ORDER

CONBOY, District Judge:

A federal jury has found that City University, without justification, punished a tenured professor on its faculty for an off-campus speech he had given, by removing him as Chairman of his academic department. It is unequivocally clear, under our Constitution, and the law enunciated on the subject by the United States Supreme Court, and in the light of the factual trial record developed in this case, that the action taken by the University was constitutionally impermissible. This is and must be the case, in spite of the hateful, poisonous and reprehensible statements made by the professor in the speech in question. This need not have been the case if the University had offered convincing, firsthand proof at trial that either the consequences of the speech disrupted the campus, classes, administration, fund-raising or faculty relations, or that the professor had turned his classroom into a forum for bizarre, shallow, racist and incompetent pseudo-thinking and pseudo-teaching. While a few shards of hearsay or self-serving evidence were offered halfheartedly by the University to suggest potentially viable defenses along these lines, the University cannot escape the astonishing picture it painted for the jury: high public and academic officials swearing under oath that they had removed the professor for tardiness in arriving at class and sending in his grades, and for asserted brutish behavior

which had been either ignored or condoned by the University.

We are, accordingly, required to uphold the jury verdict on the professor's first amendment claim, and the related punitive damage award made by the jury in justifiable disgust with the conduct of the University officials who did not act, then acted for the wrong reason, then were dishonest about their motivations in testimony before the jury.

We are asked by the defendants not to reinstate the professor in the Chairmanship even if we uphold his First Amendment claim and the punitive damages associated with it. We are told that the professor has lost nothing and hence is not irreparably harmed in his dismissal, that the award of punitive damages is an adequate measure of his injury, and that the balance of equities lies in the University's favor. If the Chairmanship meant nothing, why did the University go to such lengths in the trial to justify its denial as a proper and just sanction for a cavalcade of the professor's non-speech sins? If it meant nothing, why was it bestowed upon, and indeed accepted by one of the most eminent Black Studies scholars in America, Edmund Gordon? The punitive damages were not, of course, a measure of the professor's injury but a measure of the bad faith of the defendants. In any case, to forego reinstatement in light of the punitive damage award, ironically to be paid in this case not out of the pockets of the defendants but out of the public treasury, would put a price tag on constitutional violations and we must not, and will not, denigrate the First Amendment by doing so. Accordingly, the Court will reinstate Professor Jeffries as Chairman of the Black Studies Department for a period of two years.

As for the balance of equities, the short answer is that had the University adequately established that the professor, whose teaching has after all been tolerated for twenty years, conducts his classes or his Chairmanship in a racist, anti-semitic or incompetent manner, we would not order him to be reinstated. The confused and incompetent defense record regrettably leaves us no choice but to order the reinstatement of plaintiff.

We will, however, word the permanent injunction to make it unmistakably clear that the University is in no way restricted from monitoring the Professor's classes and his on-campus stewardship of the Chairmanship, and that he may be removed from either if a good cause basis for finding abusive or indecent behavior is adequately established. We observe, with reluctance but out of necessity, that if the University decides to pursue such a course, it ought to concern itself with such matters as witnesses, stenographic records, affidavits and the like, and not rely on pious press releases and hearsay-ridden, elliptical, hand-wringing memoranda from academic deans.

With respect to the professor's second claim, based upon an asserted property interest under the Fourteenth Amendment, we agree with the defendants that the record is insufficient and, accordingly, set aside the jury's verdict. We will proportionally reduce the damage award.

Finally, we conclude that the defense of qualified immunity is not available to the defendants, in that they violated clearly established statutory or constitutional rights of which a reasonable person would have known, and in that it was not objectively reasonable for the defendants to believe that their acts did not violate authority from the United States Supreme Court, and the Courts of this Circuit.

The reasons and legal basis for all of the above findings follow.

### Background

The relevant history of the case begins on June 5, 1991, with the unanimous reelection of Professor Jeffries as Chairman of the Black Studies Department by the faculty of the Department. *See* Trial Transcript ("Trial Tr.") 55, 185.[1] On July 1, 1991, President Harleston sent a letter of congratulations to

---

**1.** Professor Jeffries was elected Chair of the Black Studies Department every three years during the period from September of 1972 until July 1, 1992, when Professor Edmund Gordon, formerly Chair of the African American Department at Yale University, took over. *See* Trial Tr. 50, 52–54.

Professor Jeffries accepting plaintiff's election without reservation. *See* Letter from President Harleston to Professor Jeffries, dated July 1, 1991 ("I look forward to working with you and your department.... I am confident that with your assistance and guidance and with the help of your Executive Committee, we will continue to serve the students and citizens of the City College as an educational institution of the highest quality.").

Three weeks later, on July 20, 1991, Professor Jeffries made a speech at the Empire State Black Arts and Cultural Festival. *See* Plaintiff's Exhibit 3 (providing text of speech). The broad subject of the speech was the reform of the educational system to reflect diverse, and particularly minority, perspectives. It was given in response to wide criticism leveled against Professor Jeffries by some of those he attacked in his speech. Furthermore, he was speaking as an appointed consultant of the State Education Commissioner. In the speech, Professor Jeffries made strident attacks against particular individuals, and made derogatory comments about specific ethnic groups. *See id.*

The speech caused an outcry of protest and was condemned both within and without the University. On August 8, 1991, President Harleston wrote a letter to his City College colleagues attacking Professor Jeffries' speech as containing "clear statements of bigotry and anti-semitism." *See* Plaintiff's Exhibit 5, Letter from President Harleston to City College Colleagues, dated August 8, 1991.[2] In the letter, President Harleston hinted at the possibility of action being taken against Professor Jeffries in response to the speech:

> Certainly, we must insure the right of our faculty and students to express their ideas, both in and outside the classroom, without fear of institutional censorship. However,

the right to free expression and, indeed, to academic freedom is not and cannot be absolute. With freedom must come accountability.

I therefore, would like to reassure you that at the beginning of the Fall semester, I will initiate a thorough review of this situation. This review will be conducted in consultation with faculty and staff, and will follow a procedure that respects the principles of academic freedom and assures due process.

*Id.*

A memorandum from Vice Chancellor Ira Bloom to Chancellor W. Ann Reynolds, on the same day as the Harleston letter, suggested possible actions that might be taken against Professor Jeffries, including the removal of the plaintiff from his position as Chairman of the Black Studies Department. *See* Plaintiff's Exhibit 6, Memorandum from Vice Chancellor Ira Bloom to Chancellor W. Ann Reynolds, dated August 8, 1991, at 1 ("The following procedures would be applicable if consideration were to be given to removal as department chair or to disciplinary action...."). The possible actions were further discussed in a letter from Provost Robert Pfeffer to President Harleston on August 14, 1991, which also refers to the possibility of removing the plaintiff from his position as Chairman of the Black Studies Department. *See* Plaintiff's Exhibit 7, Letter from Provost Pfeffer to President Harleston, dated August 14, 1991 ("Professor de Jongh has already viewed the video-tape and does not think Jeffries' remarks were so outrageous as to be sufficient cause for his removal as department chair. It is agreed [by and among whom is not clear] that the most severe censure of Professor Jeffries should be limited to removing him as the Chair of the Black Studies Department.").

---

2. *See also* Plaintiff's Exhibit 14, Memorandum from Professor Morris Silver, Chairman of the Economics Department, to Provost Pfeffer, dated Sept. 26, 1991 ("Speaking as a Department Chairman and member to the Social Science P & B since 1969, it is my considered judgment that the ethnic slurs uttered by Professor Jeffries in this public forum represent gross deviations from proper professional discourse. The breaches of professional conduct committed by Professor Jeffries are so very serious that he has thereby disqualified himself from carrying out the duties and responsibilities of academic leader of the Black Studies Department, as defined by the CUNY Bylaws.").

On September 12, 1991, President Harleston wrote to Provost Pfeffer requesting that Pfeffer "undertake a review of Dr. Leonard Jeffries' leadership of the Black Studies Department to determine whether Dr. Jeffries can continue to act effectively as departmental administrator and as a participant in the formation, development, and interpretation of college-wide interests and policy." Plaintiff's Exhibit 9, Letter from President Harleston to Provost Pfeffer, dated September 12, 1991.[3] On September 17, 1991, President Harleston wrote to "Alumni and Friends of City College" to explain the actions he had taken since the July 20th speech, specifically with respect to the review being conducted by Provost Pfeffer. *See* Plaintiff's Exhibit 11, Letter from President Harleston to "Alumni and Friends of City College," dated September 17, 1991.[4]

In response to an unwritten request from Provost Pfeffer and President Harleston, Jeffrey Rosen, Dean of the Division of Social Sciences, wrote a memorandum on September 19, 1991, only one week after President Harleston's directive to Provost Pfeffer, which preliminarily evaluated the "recent performance" of Professor Jeffries as Chairman of the Black Studies Department. *See* Plaintiff's Exhibit 12, Memorandum from Dean Rosen to Provost Pfeffer, dated September 19, 1991; Trial Tr. 193. Dean Rosen's report, described as an "initial assessment," found that Professor Jeffries was fulfilling his duties adequately as Chairman of the Black Studies Department.[5] This docu-

ment of two pages makes it clear that the Dean's investigation consisted solely of his personal "observations" of Professor Jeffries' "discharge of ordinary administrative responsibilities" as Chair of the Black Studies Department. In a follow-up report of only three paragraphs, two weeks later, Dean Rosen again failed to find fault with Professor Jeffries' performance as Chair. Indeed, he described his interactions with Professor Jeffries as "productive" and "collegial." *See* Plaintiff's Exhibit 15, Memorandum from Dean Rosen to Provost Pfeffer, dated October 2, 1991.

On October 4, 1991, Provost Pfeffer came out with his review of Professor Jeffries' performance. *See* Plaintiff's Exhibit 16, Pfeffer "Administrative Review of Leonard Jeffries Jr.", dated Oct. 4, 1991. The review covered "Professor Jeffries' performance as Chairperson from July 1, 1991 (the commencement of his newly elected term as chair) through the present." *Id.* at 3. In the review, Provost Pfeffer found that Professor Jeffries' performance had not suffered as a result of the speech or the publicity surrounding it: "... Professor Jeffries appears to be functioning this semester at least as efficiently as over the last 10 years, and probably more so." *Id.* Pfeffer concluded his review:

"... my review of Professor Jeffries' leadership of the Black Studies Department since July 1, 1991, indicates that he is fulfilling the duties of a chair as written in

---

**3.** President Harleston elaborated on Provost Pfeffer's assignment:

"While the focus of this review is whether Dr. Jeffries can now provide effective leadership as Chair of the Black Studies Department in light of the impact his public statements have had, if any, upon the present operations of the College, and his department, the ideas he has expressed, including the speech he recently delivered in Albany, are not germane to this review."

*Id.*

**4.** *See id.,* at 1 ("The remarks [in the July 20th speech] ... have deeply hurt and offended members of these groups and threaten to undermine the very fabric of collegial life.... the sense of outrage felt by many has led to calls for actions of every variety, including swift and vengeful punishment. Some of these demands have been withdrawn or modified with the passage of time.

Academic procedure and the Bylaws of the University do not authorize us to act out of hurt or vengefulness or by way of reprisal. It is a right, however, to deliberate with our peers and according to our Bylaws on actions that may be appropriate to the issues involved.

Accordingly, I have asked the Provost to undertake an administrative review as to whether the Chair of the Black Studies Department can carry out the duties and responsibilities as Chair, as defined by the Bylaws of The City University of New York.").

**5.** *See id.* ("In summary then, the ordinary administrative responsibilities of a department Chair have been met during an extraordinary period in time. Nonetheless, the time span covered by this report is both too brief and, in many respects, too atypical to support any broad generalizations. I will therefore submit a follow-up report....").

Article 9.3 of the CUNY Bylaws. Evidence gathered from the Dean, the Social Science P & B, and the Black Studies Department indicates that Professor Jeffries has been responsibly performing those duties delineated, including scheduling courses, presiding over departmental meetings, recruiting faculty, keeping departmental records, representing the department at the P & B, and Faculty Council, etc."

*Id.* at 5.

The incomplete nature of Provost Pfeffer's "review" and Dean Rosen's "investigation" is plainly apparent in the Provost's reference in his report to conversations with Professor Morris Silver and other faculty members regarding Professor Jeffries' speech, and the consequences following upon the speech. Bearing in mind that President Harleston's charge had imprecisely attempted to define his task as determining whether Professor Jeffries' leadership as a college chairman had been compromised as a result of his speech, and whether the College had been injured by the impact of the speech, the Provost should have broadened his focus and done a more systematic analysis of Professor Jeffries' performance. For example, Provost Pfeffer could have addressed three critical areas that he instead chose to ignore in his review: whether Professor Jeffries could effectively interact as Chairman with faculty members, and specifically, Jewish faculty members, whether the racist and bigoted nature of Professor Jeffries' remarks would stigmatize and isolate the Black Studies Department, and make it a parochial backwater of the College, and whether the College's alumni would withdraw their financial support in light of the professional embarrassment Professor Jeffries represented as a formal leader of the College administration.

Such a vital inquiry was never made, either through ignorance or cowardice. This fundamental flaw in the University's response to the Jeffries' controversy doomed its position in federal court, when the inevitable lawsuit was filed.

It is apparent that the Provost's report is predicated on nothing more than the aforementioned two communications he had from Dean Rosen and single meetings with the faculty of the Black Studies Department, which broadly supported Professor Jeffries, and the Social Sciences Department P & B Committee, whose members said that Professor Jeffries continued to carry out his duties as before.

Despite the positive review by the Provost, the Board of Trustees, upon the recommendation of President Harleston, voted on October 28, 1991, to limit Professor Jeffries' appointment as Chair to one year rather than the customary three-year term. *See* Plaintiff's Exhibit 18, Minutes of the Meeting of the Board of Trustees of the City University of New York, October 28, 1991.[6] There is no documentary evidence as to what motivated this decision of the Board. The next day, President Harleston wrote to Professor Jeffries informing him that Harleston had recommended to the Chancellor and the Board of Trustees that Professor Jeffries be given only a one-year term. *See* Plaintiff's Exhibit 19, Letter from President Harleston to Professor Jeffries, dated October 29, 1991. Amazingly, President Harleston expressed concerns in this letter about the impact of Professor Jeffries' conduct upon "faculty and staff recruitment, alumni fund-raising and [the College's] relationship with the business, Government and academic communities," without having required any formal investigation into such matters.

During this period, the months of October and November, Professor Jeffries was involved in four incidents that raised concern within the administration of the University.[7] The first incident occurred on October 18, 1991, when Elliot Morgan, a student reporter from the *Harvard Crimson,* visited the plaintiff on the City College campus to conduct an

---

**6.** *See also* Plaintiff's Exhibit 21, Letter from W. Ann Reynolds to Frederick D. Schmidt of the New York State Assembly, dated November 4, 1991.

**7.** *See* "Memorandum of Law in Support of Defendants' Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, and in Opposition to Plaintiff's Request for Injunctive Relief," June 16, 1993, at 52–56 (hereinafter

interview. *See* Trial Tr. 1308–34; Defendants' Exhibit R, Memorandum from Robert E. Diaz to Chancellor Reynolds, dated November 6, 1991. During the course of the interview, which was conducted with a tape recorder in plain view, plaintiff made disparaging remarks about other scholars in the field of African–American Studies as well as homosexuals.[8] *See* Trial Tr. 1318–21. During the course of the interview, Professor Jeffries threatened to "kill" Morgan if the content of the interview ever became public. *See* Trial Tr. 1321. At the end of the interview, plaintiff had Mr. Morgan's tapes of the interview confiscated. The tapes were never returned. *See* Trial Tr. 1322–26.

The second incident occurred at the end of October, when Professor Jeffries learned from a student that "Professor Silver said that they were going to start an investigation of the Black Studies Department. . . ." Trial Tr. 388. *See* Defendants' Exhibit C. In response, Professor Jeffries wrote to Dean Rosen, declaring "war" on the faculty. *See* Defendants' Exhibit C, Memorandum from Professor Jeffries to Dean Rosen ("I am sending a notice officially to him, you, the Provost and the President that if this faculty wants war it will get it—enough is enough. We will fight fire with fire."). In addition, on October 31, 1991, Professor Jeffries went to an Economics student-faculty luncheon and exchanged "intense words" with Professor Morris Silver. *See* Trial Tr. 388.[9] We note, however, that Professor Silver did not file a formal complaint, that there was no formal proceeding initiated against Professor Jeffries as a result of the incident, (*See* Trial Tr. 389), and that Professor Silver was not called as a witness for the University at the trial.

The third incident occurred on November 12, 1991, during a meeting with Professor Jeffries, Provost Pfeffer and Dean Rosen. At the meeting, Provost Pfeffer and Dean Rosen urged plaintiff to voluntarily step down as Chairman of the Black Studies Department. *See* Trial Tr. 218–19. In response, Professor Jeffries became angry and threatened to turn City College into "Crown Heights." *See* Trial Tr. 223 (Rosen's version), 315 (Jeffries' version), 812 (Pfeffer's version); Plaintiff's Exhibit 22, Memorandum from Provost Pfeffer and Dean Rosen to President Harleston, dated November 18, 1991.

The final incident occurred on November 15, 1991, when Professor Jeffries confronted President Harleston in the lobby of the administration building, as Harleston was trying to leave for an appointment. *See* Trial Tr. 474–79 (Jeffries version), 989–91 (Harleston version). Angry over negative comments President Harleston had made on television the previous day about Professor Jeffries, the plaintiff confronted President Harleston and upbraided him in an angry and hostile manner.

During the period of these incidents, the CUNY administration was continuing to review the performance of Professor Jeffries as Chair of the Black Studies Department. From the time of the Pfeffer report, on October 4, 1991 until the Spring of 1992, Provost Pfeffer and Dean Rosen, at the direction of President Harleston, periodically reviewed the performance of Professor Jeffries as Chair. *See* Trial Tr. 771, 846, 983–85. These reviews were not written down, but were passed on orally to President Harleston during meetings. *See* Trial Tr. 845.[10] The reviews apparently became in-

"Defendants" Memorandum) (describing four incidents).

**8.** Professor Jeffries called Henry Louis Gates, Chair of the African–American Studies Department at Harvard University, "a faggot and a punk." *See* Trial Tr. 1318 (Elliot Morgan testimony). In addition, Professor Jeffries stated that homosexuality was not "natural" for blacks and was "an ice element thing." *See* Trial Tr. 1320 (Elliot Morgan testimony). Professor Jeffries further asserted that when he was in Europe, European men used to offer their wives to him in exchange for gay sex. *See id.*

**9.** Professor Jeffries claims that the secretary went into the luncheon and Professor Silver

came out to talk with Jeffries. *See* Trial Tr. 458. In his letter, Professor Silver suggests that Professor Jeffries actually entered and disturbed the luncheon in progress. *See* Defendants' Exhibit D, Letter from Morris Silver, Chair of the Department of Economics, to Dean Rosen, dated October 31, 1991.

**10.** During the period between October 4, 1991 and May 22, 1992, Provost Pfeffer and Dean Rosen did write one memorandum to President Harleston with respect to Professor Jeffries. *See* Plaintiff's Exhibit 22, Memorandum from Provost Pfeffer and Dean Rosen to President Harle-

creasingly negative (*See* Trial Tr. 985), and in December of 1991, President Harleston, Provost Pfeffer, and Dean Rosen came to an agreement that Professor Jeffries should be replaced as Chairman. *See* Trial Tr. 541, 898, 991. Astonishingly, there is no written record or document of any kind that memorializes this important decision on the part of the CUNY administration, or the reasons for it.

On March 20, 1992, President Harleston and Provost Pfeffer met with the faculty of the Black Studies Department to "advise" them of President Harleston's decision to recommend to the Board of Trustees that Professor Edmund Gordon be named as the new Chairperson of the Department. *See* Trial Tr. 1002–03. In this meeting, President Harleston also sought to get "input" from the Black Studies faculty with respect to his recommendation to appoint Professor Gordon. *See id.*

The reaction of the Department to President Harleston's recommendation was extremely negative. *See* Trial Tr. 322–23, 1003. The same day as the meeting, the Black Studies Department Executive Committee and full-time faculty sent a memorandum to President Harleston protesting the actions of the Board of Trustees to limit Professor Jeffries' term as Chairman of the Black Studies Department without consulting the Department. *See* Plaintiff's Exhibit 24, Memorandum from the Black Studies Department Executive Committee and full-time faculty to President Harleston, dated March 20, 1992.[11]

On March 23, 1992, the Board of Trustees voted to appoint Professor Gordon as the new Chair upon the expiration of plaintiff's one-year term, effective July 1, 1992. *See* Plaintiff's Exhibit 25, Minutes of the Board of Trustees meeting, March 23, 1992. As with its October vote, there is no formal record or document of any kind that explains the reasons for the Board's actions. At the

meeting, there was virtually no discussion of Professor Jeffries or of his performance as Chairman of the Black Studies Department. *See* Trial Tr. 1007, 1159, 1196, 1306–07, 1690, 1708. Professor Gordon became the new Chairman of the Department as planned on July 1, 1992.

On June 5, 1992, roughly one month before Professor Gordon took over, Professor Jeffries commenced this action, alleging that defendants' denial of his full three-year term as Chairman of the Black Studies Department had violated his rights under the First and Fourteenth Amendments to the United States Constitution. The trial was conducted from April 22, 1993, to May 18, 1993.

After the closings, the Court submitted three separate verdict sheets to the jury. The first verdict sheet contained five questions, which the jury answered in the following manner:

1. Has the plaintiff proven by a preponderance of the evidence that Leonard Jeffries' July 20, 1991 speech in Albany was a substantial or motivating factor in the denial of plaintiff's three-year term as Chairman of the Black Studies Department? "Yes."

2. Have the defendants shown by a preponderance of the evidence that Leonard Jeffries would have been denied a full three-year term as Chairman of the Black Studies Department even had Jeffries not made his July 20, 1991 speech? "No."

3. Have the defendants proven by a preponderance of the evidence that Leonard Jeffries' July 20, 1991 speech hampered the effective and efficient operation of the Black Studies Department, the College, or the University? "No."

4. If the answer to question # 3 was "no," have the defendants proven by a preponderance of the evidence that the defendants were motivated in their actions by a reasonable expectation that the plaintiff's July 20,

---

ston, dated November 18, 1991. However, the purpose of this memorandum appears to be more a description of a particular incident than a review of Professor Jeffries' performance as Chair of the Black Studies Department. *See id.*

11. *See id.* ("The Executive and Search Committee and the faculty of the Department of Black

Studies, have never been informed in writing of any decisions taken by the CUNY Board of Trustees regarding the supervision and/or removal of our Chairman. The Board's action, was, in effect, a direct negation of our May 1991 reelection of Dr. L. Jeffries, Jr. for another three-year period, i.e., September 1991—August 1994.").

1991 speech would cause the disruption of the effective and efficient operation of the Black Studies Department, the College, or the University? "Yes."

5. Has the plaintiff proven by a preponderance of the evidence that the defendants deprived him of property without due process of law? "Yes."

After receiving the jury's responses to Verdict Sheet #1, the Court weighed the jury's factual findings and found that the plaintiff's rights under the First Amendment had been violated. *See* 820 F.Supp. 741 (S.D.N.Y.1993); Trial Tr. 2035–2040.

In the second verdict sheet on individual liability, the jury determined that two of the defendants—Bernard W. Harleston and W. Ann Reynolds—had violated plaintiff's Fourteenth Amendment rights and that six of the defendants—Bernard W. Harleston, W. Ann Reynolds, Edith B. Everett, Herman Badillo, Sylvia Bloom, and Harold M. Jacobs—had violated plaintiff's First Amendment rights. In the third and final verdict sheet, the jury awarded punitive damages to the plaintiff in the sum of $400,000, divided as follows: $80,000 against each of the four Trustees, Edith B. Everett, Herman Badillo, Sylvia Bloom, and Harold M. Jacobs; $50,000 against Chancellor Reynolds; and $30,000 against President Harleston.

After the verdict, plaintiff moved for a permanent injunction reinstating him to his position as Chairman of the Black Studies Department. Defendants have opposed plaintiff's motion and have moved to overturn the jury's verdict on the ground that the evidence is insufficient to sustain the verdict. The defendants have also moved to overturn the punitive damages award on the grounds that defendants are qualifiedly immune from liability and that the jury verdict with respect to defendants' motivation for denying Professor Jeffries his full three-year term as Chairman is inconsistent.

## Discussion

### A. Sufficiency of the Evidence

■ Defendants maintain that they are entitled to judgment as a matter of law or, in the alternative, a new trial because the record does not support several key findings of the jury. *See* Defendants' Memorandum, at 35–48. A jury verdict should be overturned on the ground that the evidence was insufficient to support the verdict only when:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [people] could not arrive at a verdict against him.

*Mallis v. Bankers Trust Co.,* 717 F.2d 683, 688–89 (2d Cir.1983); *see also Bauer v. Raymark Indus., Inc.,* 849 F.2d 790, 792 (2d Cir.1988), *citing Mallis; Berkovich v. Hicks,* 922 F.2d 1018, 1026 (2d Cir.1991), *citing Bauer.* In light of this standard, and in view of the evidence in the record, the Court denies the defendants' motion with respect to the First Amendment issues, but grants the defendants' motion with respect to the Fourteenth Amendment claim.

■ With respect to plaintiff's First Amendment claim, the defendants argue that the evidence was insufficient to warrant the jury's findings on each of the factors germane to the issue of liability. Judge Kearse has described these factors in two recent opinions. *See White Plains Towing Corp. v. Patterson,* 991 F.2d 1049 (2d Cir.1993); *Frank v. Relin,* 1 F.3d 1317 (2d Cir.1993). A public employee who seeks judicial relief on the ground that he has been removed because of the exercise of his First Amendment speech rights must establish, as an initial matter, that his speech may be fairly characterized as constituting speech on matters of public concern. *White Plains Towing Corp. v. Patterson,* 991 F.2d at 1058 (citations and quotations omitted). "Once the employee establishes that he has spoken as a citizen on a matter of public concern, he must establish that that speech was at least a 'substantial' or 'motivating' factor in the discharge." *Id., citing Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). "If the plaintiff establishes both of these elements, the employer may nonetheless escape liability in either of two ways. It may prevail if it

can show that it would have made the same decision in the absence of the protected conduct, *see Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. at 286 [97 S.Ct. at 575], or if it can show that the employee's conduct interfered with its 'effective and efficient fulfillment of its responsibilities to the public,' *Connick v. Myers,* 461 U.S. [138] at 150 [103 S.Ct. 1684, 1692, 75 L.Ed.2d 708]." *Frank v. Relin,* at 1329.

### 1. *The Speech Was a Substantial or Motivating Factor:*

■ Defendants maintain that the evidence is insufficient to support the jury's finding on Verdict Sheet # 1 that Professor Jeffries' July 20, 1991 speech was a substantial or motivating factor in the denial of plaintiff's full three-year term as Chairman of the Black Studies Department.

We note initially that in discerning the intentions of defendants, it is rare indeed when a defendant admits on the witness stand that he was motivated by potentially unconstitutional reasons. As a result, juries must often look beyond the testimony and conclusory statements of the witnesses and draw inferences from the evidence.

We believe that the jury could reasonably have inferred from the evidence presented in this case that the July 20, 1991 speech of Professor Jeffries was a substantial or motivating factor in the decision of the defendants to deny him his full three-year term as Chairman of the Black Studies Department. We are persuaded, most significantly, perhaps, by the fact that the defendants have failed to offer an alternative and credible explanation for the about-face in President Harleston's attitude toward the plaintiff that followed immediately upon the heels of the Albany speech of July 20, 1991, and for the dramatic sense of urgency throughout the administration regarding the plaintiff's status that developed immediately following the speech.

As noted, after Professor Jeffries' reelection in June 1991 as Chairman of the Black Studies Department, President Harleston sent the plaintiff a letter of congratulations, indicating that he was satisfied with the performance of the plaintiff in his capacity as Chairman. *See* Letter from President Bernard W. Harleston to Professor Jeffries, dated July 1, 1991.[12] A mere three weeks later, however, after plaintiff's speech on July 20, 1991, President Harleston's attitude toward the plaintiff shifted dramatically, and there developed within the CUNY administration an acute absorption and urgency regarding what actions needed to be taken in response to the speech.[13] The evidence establishes that the plaintiff's July 20, 1991 speech and the surrounding controversy led President Harleston to request Provost Pfeffer to review Professor Jeffries' performance as Chair. *See* Trial Tr. 726, 968–69, 1048, 1050; *see also* Plaintiff's Exhibit 9, Letter from President Harleston to Provost Pfeffer, dated September 12, 1991.[14] As described above, the Pfeffer review, however, concluded that Professor Jeffries was adequately fulfilling his duties as Chairman of the Black

---

**12.** *See also* Trial Tr. 1047–48 (Neither Provost Pfeffer nor Dean Rosen had any objections to plaintiff's reelection as Chair of the Department.).

**13.** *See* Plaintiff's Exhibit 5, Letter from President Harleston to City College Colleagues, dated August 8, 1991; *see also* Plaintiff's Exhibit 7, Letter from Provost Pfeffer to President Harleston, dated August 14, 1991, at 4–5 ("... it is imperative that the administration move quickly to react to the Jeffries statements. As soon as possible you should convene a meeting with the Black Studies Department and meet with the Executive Committee of the Faculty Senate and Faculty Council to gather opinions. In addition it may be advisable to form a new ad-hoc committee ... The assigned bodies must be called into action during the first week in September and charged to report back to you no later than the end of September."); Trial Tr. 720 (cross-examination of Chancellor Reynolds) ("Because the speech we're referring to caused a great media outcry, came to the attention of myself, the board. I made further inquiry, dealt with the media concerns, and moved ahead.").

**14.** *See id.* ("While the focus of this review is whether Dr. Jeffries can now provide effective leadership as Chair of the Black Studies Department *in light of the impact his public statements have had,* if any, upon the present operations of the College, and his department, the ideas he has expressed, including the speech he recently deliv-

Studies Department. *See* Plaintiff's Exhibit 16, Pfeffer "Administrative Review of Leonard Jeffries Jr.", dated Oct. 4, 1991.

Despite the positive result of the Pfeffer review, and despite the fact that there is no indication that anything happened between October 4, 1991 and October 28, 1991 that changed the status of the positive review, the Board of Trustees, upon the recommendation of President Harleston, voted on October 28, 1991, to limit Professor Jeffries' appointment as Chair to one year rather than the customary three-year term. *See* Plaintiff's Exhibit 18, Minutes of the Meeting of the Board of Trustees of the City University of New York, October 28, 1991.[15] Given the positive result of the Pfeffer review, we believe that it was reasonable for the jury to conclude that the cause of President Harleston's recommendation and of the Board's decision to limit plaintiff's term to one year was plaintiff's July 20, 1991 speech.[16]

We further believe that it was reasonable for the jury to conclude that the March 23, 1992 decision of the Board to appoint Dr. Gordon as Chairman of the Black Studies Department, effectively replacing Professor Jeffries, was motivated in substantial part by the plaintiff's speech. We observe that at the March 23, 1992 meeting, the Board did not discuss Professor Jeffries or his performance as Chair of the Black Studies Department. *See* Trial Tr. 1007, 1159, 1196, 1306–07, 1690, 1708. In this absence, it was reasonable for the jury to conclude that the motivation for the Board's March 23, 1992 vote was similar to its motivation in voting on October 28, 1991 to limit the plaintiff's term

to one year. Indeed, we believe that it was rational for the jury to perceive the October 28, 1991 and March 23, 1992 votes as part of a chain of events that began immediately following the plaintiff's speech and had as their root cause the plaintiff's speech and the publicity surrounding it.[17]

We observe that defendants have presented not one scintilla of credible evidence that the dramatic shift in President Harleston's attitude toward the plaintiff and the accompanying sense of urgency within the administration, as documented in the exhibits, was caused by anything other than plaintiff's July 20, 1991 speech. Nor have the defendants presented credible evidence that this sense of urgency was not the underlying cause for the decision of the defendants to deny the plaintiff his full three-year term, as initially voted on by the Board of Trustees on October 28, 1991, and then again on March 23, 1992.

Moreover, we note that with respect to this factual issue, the Attorney General espoused a position before the jury that contradicted a position he had previously advocated before the Court. Specifically, on the day the jury was to be selected, the Attorney General stated in open court that, in denying plaintiff his full three-year term as Chairman of the Black Studies Department, the defendants were motivated by the July 20, 1991 speech. *See* Trial Tr. 17–18 (April 20, 1993) (Attorney General argues that defendants were motivated by speech, but only by anti-semitic portions of speech). Subsequently, the Attorney General argued to the jury that the defendants were not motivated by the speech. *See* Trial Tr. 31, 46 (April 22, 1993).

ered in Albany, are not germane to this review." (emphasis added)).

**15.** We observe that while the Elliot Morgan incident occurred on October 18, 1992, ten days before the Board of Trustee's election on October 28, 1991, there is no evidence that the incident was a factor in President Harleston's recommendation or in the Board's decision. Indeed, there is no evidence that the Trustees were even aware of the incident before they took their vote.

**16.** *See* Plaintiff's Exhibit 21, Letter from W. Ann Reynolds to Frederick D. Schmidt of the New York State Assembly, dated November 4, 1991 ("... I wish to inform you that a recommendation by Dr. Bernard W. Harleston, President of The City College, which I supported, that Dr. Jeffries' term of office as Chairperson of The City

College Black Studies Department be limited to one year, through June, 1992, rather than the usual three-year term, was approved on the evening of October 28, 1991, by the Board of Trustees of The City University of New York.... We remain deeply disturbed by the irresponsible and inflammatory statements made by Professor Jeffries during the summer at the forum in Albany.").

**17.** Testimony in the record indicates that several Trustees opposed the continuation of Professor Jeffries' Chairmanship specifically because of the July 20, 1991 speech. *See infra*, n. 24. We believe that this testimony provides sufficient evidence from which a jury could infer that the July 20, 1991 speech was a substantial or motivating factor in the votes of the Board of Trustees which denied plaintiff his full three-year term as Chairman of the Black Studies Department.

We find inexplicable how responsible public officials could take such plainly contradictory positions in federal court, except to note that the Court pointed out to the Attorney General that adherence to his initial position would tend to obviate the need of plaintiff to carry his burden of proof on one of the elements of his First Amendment claim. *See Jeffries v. Harleston,* 820 F.Supp. 739, 741 (S.D.N.Y. 1993).

In any case, we believe that it was entirely rational for the jury to conclude that the plaintiff's July 20, 1991 speech; having provoked a media uproar, caused a sense of urgency within the CUNY administration, that this sense of urgency led to the defendants' decision to deny the plaintiff his full three-year term, and that, as a result, the speech was a substantial or motivating factor in the denial of plaintiff's full three-year term as Chairman of the Black Studies Department.

### 2. *But for the July 20, 1991 Speech:*

Defendants further claim that the evidence is insufficient to support the jury's finding on Verdict Sheet # 1 that Leonard Jeffries would not have been denied a full three-year term as Chairman of the Black Studies Department had Jeffries not made his July 20, 1991 speech. In support of this claim, defendants assert that at the time the speech was given, they were already in the process of trying to replace Professor Jeffries. *See* Defendants' Memorandum, at 38.

We observe that while the defendants do seem to have been in the process of searching for a replacement for Professor Jeffries before the speech was given (*See* Trial Tr. 174–76, 764–65), there is insufficient evidence that there was a purposeful and structured search or a sense of urgency about the matter, the kind of urgency that might lead to a decision not to let the plaintiff serve out his

full three-year term. In light of the fact that the documentary evidence reveals a dramatic and new sense of urgency with respect to Professor Jeffries' status immediately following the plaintiff's July 20, 1991 speech, we believe it was entirely reasonable for the jury to conclude that the speech caused the sense of urgency, and that without this sense of urgency defendants would not have denied the plaintiff his full three-year term as Chairman of the Black Studies Department.[18]

### 3. *Hampering the Effective and Efficient Operation of the School:*

Defendants also argue that the evidence contradicts the jury's finding on Verdict Sheet # 1 that Leonard Jeffries' July 20, 1991 speech did not hamper the effective and efficient operation of the Black Studies Department, the College, or the University.[19] In support of its position, defendants cite to three "disruptive" incidents (the October 18, 1991 Elliot Morgan incident, the November 12, 1991 confrontation with Dean Rosen and Provost Pfeffer, and the November 15, 1991 confrontation with President Harleston), which, according to defendants, would not have occurred had it not been for the July 20, 1991 speech. *See* Defendants' Memorandum, at 39–40.

The Court does not agree that no reasonable jury could have failed to find the nexus defendants attempt to draw between the three incidents and the plaintiff's July 20, 1991 speech. The defendants' position is undermined by their own presentation at trial of broad evidence of impropriety and extremely questionable behavior on the part of Professor Jeffries well before the speech. *See* Defendants' Exhibit F, Letter from Margaret Murphy to Dean Rosen, dated April 1, 1991; Defendants' Exhibit G, Letter from President Harleston to Professor Jeffries, dated September 16, 1988; Defendants' Exhibit H, Memorandum from Morris Silber-

---

**18.** *See* Trial Tr. 242–43 (Dean Rosen indicates on cross-examination that he may have had concerns about Professor Jeffries' performance before the July 20, 1991 speech, but that these concerns did not rise to a level that would require formal action be taken against Professor Jeffries).

**19.** We note that it was the defendants' burden to prove by a preponderance of the evidence that the plaintiff's July 20, 1991 speech hampered the effective and efficient operation of the Black Studies Department, the College, or the University. *See* Verdict Sheet # 1. The jury found that the defendants did not carry this burden.

berg, Dean for Faculty Relations, to President Harleston, dated September 15, 1988; Defendants' Exhibit I, "Report of Inquiry Regarding Allegations Made by Mitchell A. Seligson," dated February 12, 1985; Defendants' Exhibit J, Letter from Bernard Harleston to Professor Jeffries, dated March 8, 1985; Exhibit K, Memorandum from Bernard Harleston to Provost Harry Lustig, *et al.*, dated March 8, 1985. This evidence suggests, and certainly the jury could have found, that the three incidents cited by defendants were not related to the July 20, 1991 speech, but, on the contrary, were characteristic of Professor Jeffries' conduct throughout his tenure at the College.[20]

Beyond these three incidents, defendants rely upon shards of testimony here and there in the record that they say persuasively prove the disruptive impact of the speech. However, there was no attempt to develop a systematic record of such disruption. For example, during his redirect examination, President Harleston remarked that:

> With respect to alumni fund raising, we had evidence that pledges had been either voided or people had failed to make a payment of sort having promised to do so.

Trial Tr. 1263. We observe that defendants made no attempt to provide data or an analysis of alumni giving after the speech. Nor did the defendants present any correspondence from alumni or put on the stand a single alumnus to confirm Professor Harleston's conclusory statement. In the absence of more concrete evidence concerning a decline in alumni contributions following the July 20, 1991 speech, we believe it was en-

tirely reasonable for the jury to conclude that the evidence did not support the conclusion that alumni giving had declined to such an extent as to constitute a "hampering of the effective and efficient operation" of CUNY.

Nor did the Attorney General put on the stand a single CUNY student to testify about possible negative effects of the speech on the functioning of classes or the teacher-student relationship. For example, there was no testimony from a student who decided against taking a particular class as a result of Professor Jeffries' speech. Nor did the Attorney General put a member of the faculty on the stand who indicated that he would have difficulty working with Professor Jeffries as a result of the July 20, 1991 speech.

Indeed, the only official written evaluations of Professor Jeffries' performance as Chairman of the Black Studies Department after the July 20, 1991 speech indicate that the speech did *not* cause any hampering whatsoever of the functioning of the University. *See* Plaintiff's Exhibits 12, 15, 16. In the face of this evidence, we are satisfied that a jury could have reasonably concluded that Leonard Jeffries' July 20, 1991 speech did not hamper the effective and efficient operation of the Black Studies Department, the College, or the University.[21]

### 4. *Deprivation of Professor Jeffries' Rights:*

Defendants also argue that the evidence is insufficient to support the jury's finding that the four Trustees found liable by

---

**20.** In addition, even if the three incidents had been caused by the speech, we believe there is sufficient evidence from which the jury could have concluded that the incidents did not rise to the level of "hampering the effective and efficient operation of the Black Studies Department, the College, or the University."

**21.** Defendants further maintain that there was evidence that the speech and the publicity surrounding it caused Professor Jeffries to be away from campus more often than he had been before. Defendants' Memorandum, at 40. Defendants cite to their Exhibit L, which indicates that Professor Jeffries had more speaking engagements following his July 20, 1991 speech. *See* Defendants' Exhibit L, "The City University of

New York, Multiple Position Reports." The Court does not believe that the defendants have drawn a firm connection between Professor Jeffries' increased number of speaking engagements and a lack of adequate performance on the part of Professor Jeffries as Chair of the Black Studies Department. For example, the defendants have not provided evidence that Professor Jeffries was absent from class more often as a result of his increased speaking engagements. Moreover, we observe that Professor Jeffries' speaking engagement schedule was specifically approved by the CUNY administration. *See* Trial Tr. 867–68. In any case, we believe that the jury could have reasonably concluded that the increase in speaking engagements did not represent a "hampering of the efficient and effective operation" of CUNY.

the jury caused a deprivation of Professor Jeffries' rights. We disagree. All of the four Trustees took part in the March 23, 1992 Board of Trustees vote, which definitively denied plaintiff his full three-year term as Chairman of the Black Studies Department. *See* Plaintiff's Exhibit 25, Minutes of the Board of Trustees meeting, March 23, 1992.[22] The Court believes that the votes of these Trustees in the March 23, 1992 meeting constitute participation in the violation of plaintiff's constitutional rights.[23] Accordingly, we find that the evidence was sufficient to support the jury's finding that the four Trustees caused a deprivation of Professor Jeffries' rights.[24]

**22.** Defendants seem to argue that the October 28, 1991 vote of the Board of Trustees definitively denied plaintiff his full three-year term as Chairman of the Black Studies Department, and that the March 23, 1992 vote, which appointed Professor Gordon as the new Chair of the Black Studies Department, did not concern Professor Jeffries. We disagree. While the October 28, 1991 vote played a significant role in the denial of plaintiff's full three-year term as Chairman, the denial was not consummated until the March 23, 1992 vote. This fact is confirmed by a letter from President Harleston to Professor Jeffries, written one day after the Board of Trustees vote. In the letter, President Harleston informed Professor Jeffries of Harleston's recommendation that Jeffries be appointed for only a one-year term. President Harleston explained the reasoning behind his recommendation:

> This will afford me a fuller opportunity to review this matter and assess your ongoing performance as Chair of the Black Studies Department.

Plaintiff's Exhibit 19, Letter from President Harleston to Professor Jeffries, dated October 29, 1991. President Harleston's letter implies that the October 28, 1991 vote was not the final decision with respect to Professor Jeffries' future as Chairman of the Black Studies Department and that further evaluation of Professor Jeffries' performance was necessary. *See also* Trial Tr. 334, 1084. Accordingly, we find that there was sufficient evidence in the record from which the jury could have concluded that the Board's final decision to deny plaintiff his full three-year term did not take place until the March 23, 1992 vote. We also find that the jury could have reasonably concluded that the defendants' votes at the March 23, 1992 meeting of the Board of Trustees constituted participation in the deprivation of plaintiff's rights.

**23.** The defendants seem to suggest that Trustees can never be held liable, because they simply defer to the recommendations of the CUNY administration. *See* Defendants' Memorandum, at

## 5. *Property Interest in Chairmanship*

■ Defendants also maintain that the evidence is insufficient to support the jury's finding on Verdict Sheet # 1 that Leonard Jeffries had a property interest in his Chairmanship once he had been elected. We agree.

■ "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or *mutually explicit* understandings that support [the person's] claim or entitlement to the benefit and that he may invoke a hearing." *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699,

43. The Court rejects this attempt to escape responsibility on the part of the Trustees. By all accounts, the Board of Trustees is a powerful and influential institution in the CUNY system. The members of such an institution, we believe, cannot escape accountability for the consequences of their decisions by pointing fingers at those who gave them advice or by claiming that their involvement in the violation of constitutional rights was merely passive.

The Court also rejects defendants' attempt to escape liability on the ground that even had one of them changed their vote, the outcome would have remained the same. Defendants seem to suggest that a Board of Trustees can vote to violate an individual's constitutional rights, and its members can escape personal liability as long as the vote is not close. *See* Defendants' Memorandum, at 42–43. We find the defendants' argument fallacious. Under defendants' reasoning, a participant in the violation of someone's constitutional rights can escape civil liability as long as they can show that the violation would have occurred even without their participation. We do not believe that this "but for" requirement to a finding of personal liability (the constitutional violation would not have occurred, "but for" the participation of the defendant) is applicable to this case.

**24.** The Court notes that testimony in the record indicates that the four trustees opposed the continued Chairmanship of Professor Jeffries and that this opposition was a result of the plaintiff's July 20, 1991 speech. *See* Trial Tr. 679–81, 1081, 1627, 1664–65, 1675. We believe that this testimony was sufficient evidence from which a jury could reasonably infer that the opposition of the four trustees to the speech caused them to vote for the appointment of Professor Gordon at the March 23, 1992 meeting. Given the fact that none of the four trustees found liable chose to testify to rebut this inference, we believe that it was reasonable for the jury to infer that the four trustees participated in the deprivation of plaintiff's constitutional rights.

33 L.Ed.2d 570 (1972) (emphasis added); *accord Schwartz v. Mayor's Comm. on the Judiciary of New York*, 816 F.2d 54, 57 (2d Cir.1987). Thus, a property interest cannot arise from the mere past practices of an employer. *See Schwartz*, 816 F.2d at 57 ("[T]he fact that many, or even most, incumbent judges have been reappointed cannot raise [plaintiff judge's] subjective expectation' [of being reappointed] to a constitutionally protected right...."); *Hermes v. Hein*, 742 F.2d 350, 355 (7th Cir.1984); *Bollow v. Federal Reserve Bank*, 650 F.2d 1093, 1099 (9th Cir.1981), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982); *Swift v. United States*, 649 F.Supp. 596, 599–600 (D.D.C.1986). Rather, the government employer must also engage in some sort of affirmative conduct that indicates that the employer's past practices were meant to be part of a "mutually explicit" understanding between it and its employees. *See Bollow*, 650 F.2d at 1099; *Swift*, 649 F.Supp. at 599–600.

In the instant case, the only evidence on the record about CUNY's custom or practice regarding appointments of chairpersons, given in the testimony of Chancellor Reynolds (*See* Trial Tr. 530–32, 654–55, 658–60), is that professors who are elected by their departments are almost always approved by the President of CUNY and the Board of Trustees. Under the case authority discussed above, this evidence is insufficient to support Professor Jeffries' contention that after his election to the Chairmanship by his department he had a property interest in the Chairmanship.[25]

Moreover, Professor Jeffries' Fourteenth Amendment claim must fail on another ground. It is well settled in this Circuit that "mutual understandings and customs

[do] not create a property interest for purposes of due process when they are contrary to the express provisions of regulations and statutes." *Baden v. Koch*, 638 F.2d 486, 492 (2d Cir.1980); *accord Hawkins v. Steingut*, 829 F.2d 317, 321–22 (2d Cir.1987); *Schwartz*, 816 F.2d at 57.

In the instant case, the CUNY Bylaws contemplate that the CUNY President and the Board of Trustees can choose not to approve a Chairperson-elect. *See* Ex. 26, CUNY Bylaws §§ 9.1(b), (c) ("Such elections [for chairperson] shall be subject to the approval of the President and the Board."). The CUNY Board of Trustees is empowered by state statute to adopt Bylaws for CUNY, (*see* N.Y.Educ.Law § 226(10) (McKinney 1988)), and we therefore believe that these Bylaws have the status of "regulations · or statutes" within the meaning of *Baden*. Because the Board of Trustees and President Harleston were authorized by the Bylaws to exercise their discretion in appointing department chairpersons, and because raising Professor Jeffries' "subjective expectation" of reappointment to a constitutionally protected interest would contradict the CUNY Bylaws, we conclude that Professor Jeffries' Fourteenth Amendment claim must fail. *See Hawkins*, 829 F.2d at 321–22; *Schwartz*, 816 F.2d at 56–57; *Baden*, 638 F.2d at 492–93.[26] Accordingly, defendants' motion to dismiss plaintiff's Fourteenth Amendment claim is granted.

## B. Consistency of Verdict

Defendants maintain that they are entitled to judgment as a matter of law vacating the punitive damages award on the ground that the awarding of such damages is precluded by the jury's initial finding as to the defen-

---

25. We observe that in order to establish that the denial of his full three-year term as Chairman of the Black Studies Department violated his First Amendment rights, plaintiff need not have a "property interest" in the Chairmanship. *See Perry v. Sindermann*, 408 U.S. 593, 599, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972); *Dube v. State Univ.*, 900 F.2d 587, 597–99 (2d Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991).

26. We observe that raising Professor Jeffries' "subjective expectation" of reappointment to a

constitutionally protected interest seems also to contradict N.Y.Educ.Law § 6212(4) (McKinney 1988), which indicates that chairpersons of departments at CUNY do not have "tenure" in their positions as chairpersons. Tenure is defined by the education law as "the right of a person to hold his position during good behavior and efficient and competent service, and not to be removed therefrom except for cause...." N.Y.Educ.Law § 6212(1)(c).

dants' state of mind. In this argument, the defendants refer to question #4 on Verdict Sheet #1, in which the jury found that the defendants were motivated in their actions by a reasonable expectation that the plaintiff's July 20, 1991 speech would cause the disruption of the effective and efficient operation of the Black Studies Department, the College, or the University. This motivation, according to the defendants, is incompatible with the notion of evil intent or callous indifference, the states of mind required for an award of punitive damages. *See Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983).

 The Second Circuit has held that "'[i]t is the duty of the court to attempt to harmonize the answers, if it is possible under a fair reading of them.'" *Auwood v. Harry Brandt Booking Office, Inc.,* 850 F.2d 884, 891 (2d Cir.1988), *citing* C. Wright & A. Miller, Federal Practice and Procedure § 2510, at 515 (2d ed. 1971). The jury was properly instructed on the elements of punitive damages and on the defendants' defenses. There is a strong presumption that the jury properly followed these instructions. *See United States v. Casamento,* 887 F.2d 1141, 1151 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). Accordingly, a court must uphold the verdict of a properly-instructed jury if there is any "plausible" explanation for the purported inconsistency in their verdict. *See United States Football v. National Football League,* 644 F.Supp. 1040, 1046 (S.D.N.Y. 1986) ("the Seventh Amendment imposes upon the courts a constitutional obligation to search for an interpretation of the case which reconciles the verdicts, ... and which respects the principle that 'juries are not bound by what seems inescapable logic to judges'" (citations omitted)), *aff'd,* 842 F.2d 1335 (2d Cir.1988).

 In view of this standard, we do not believe that the jury's verdict with respect to the defendants' motivation is incompatible with a finding of punitive damages. Specifi-

cally, we believe that there are two possible interpretations of the jury's verdict which would reconcile these assertedly inconsistent findings. First, the jury could have reasonably believed that the six defendants found liable all shared a reasonable expectation that the plaintiff's July 20, 1991 speech would cause hampering of the efficient and effective operation of the University, but at the same time, that these six defendants were aware that they could not retaliate against Professor Jeffries in response to his speech unless there was actual hampering, not just the future prospect of disruption. In such a scenario, the six defendants, by denying plaintiff his full three-year term, would have been knowingly and willfully violating the constitutional rights of the plaintiff, in a manner that a jury could reasonably have found warranted an award of punitive damages.

Second, in answering question #4 on Verdict Sheet #1, the jury could have reasonably found that while a majority of the defendants had a reasonable expectation that the plaintiff's July 20, 1991 speech would cause hampering of the efficient and effective operation of the University, the six defendants found liable did not have this reasonable expectation. Thus, we believe that the jury could have interpreted question #4 on Verdict Sheet #1 as a finding with respect to the collective or majority state of mind of the defendants, but that this finding did not preclude the jury's subsequent finding that individual defendants did not share the reasonable expectation of hampering.

Accordingly, we do not believe that the awarding of punitive damages was inconsistent with the jury's initial finding with respect to the defendants' state of mind, and we deny defendants' motion to vacate the punitive damage awards.

## C. Qualified Immunity

 Defendants contend that the jury's punitive damages award should be set aside because the defendants are entitled to qualified immunity.[27] We disagree.

**27.** In their post-trial motions, defendants have not contested the correctness of our pretrial, and trial orders in this case. Nevertheless, our qualified immunity discussion should also be read as an elaboration of the legal reasoning behind those Orders, particularly those Orders of April 21, 1993 (820 F.Supp. 739 (S.D.N.Y.1993)) and May 11, 1993 (820 F.Supp. 741 (S.D.N.Y.1993)).

The Second Circuit has recently stated that

> [t]he doctrine of qualified immunity shields state officials from liability for damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights. An official does not have such immunity where the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right. To determine whether a particular right was clearly established at the time defendants acted, a court should consider: (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful.

*White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1064–65 (2d Cir.1993) (citations and internal quotation marks omitted).[28] The Supreme Court has made clear that an official is not entitled to qualified immunity simply because at the time of the official's act no court had held that exact type of act unlawful. Rather, an official is entitled to qualified immunity only if in light of preexisting law the unlawfulness of the official's act would not have been apparent to the official at the time that he or she committed it. *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). As we noted above, the legal issue in this case is whether a University may deny a professor a department chairmanship because of the professor's out-of-class speech, when the professor's speech substantially involved matters of public concern and where the speech caused no actual interference with the functioning of the University. Although neither the Second Circuit nor the Supreme Court has ruled on this specific question, we believe that in light of the Second Circuit's decision in *Piesco v. City of New York Dept. of Personnel,* 933 F.2d 1149 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991), and the Supreme Court's decision in *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 483 U.S. 378 (1987), that at the time the defendants unconstitutionally denied Professor Jeffries a full three-year term as Chairman of the Black Studies Department, reasonable persons in defendants' positions would have understood that this denial was unlawful.

In *Piesco,* the plaintiff, Dr. Judith Piesco, was the Deputy Personnel Director for Examinations in the New York City Department of Personnel ("DOP"). "In that capacity, she was responsible for the administration of the Bureau of Examinations, the largest bureau within DOP. The Bureau of Examinations is charged with the preparation, evaluation, and administration of all civil service tests for the City of New York. During Dr. Piesco's tenure at DOP, the size of her staff fluctuated between 175–200 employees." *Id.* at 1151.

During testimony before a New York State Senate Committee, Dr. Piesco indicated to the Committee that a functional illiterate could pass the Police Academy Entrance Examination. *See id.* at 1152. In response to Dr. Piesco's testimony, the *Piesco* defendants gave Dr. Piesco two negative performance evaluations which improperly criticized her conduct, placed a letter in Dr. Piesco's personnel file that criticized Dr. Piesco for her behavior at a July 31, 1985 meeting, and

---

**28.** Defendants have cited numerous cases from other circuits as support for their claim that Professor Jeffries' First Amendment rights were not clearly established at the time that defendants denied Professor Jeffries a full three-year term as Chairman of the Black Studies Department. As is apparent from the Second Circuit's opinion in *Patterson,* the relevant authority that we must look to in determining whether Professor Jeffries' First Amendment rights were clearly established is opinions of the United States Supreme Court and opinions of the United States Court of Appeals for the Second Circuit. Because we find, *infra,* that under this authority, Professor Jeffries' First Amendment rights were clearly established at the time defendants denied him a full three-year term we need not look to cases in other circuits. Nevertheless, at some points in this opinion, we will distinguish case authority from other circuits.

excluded Dr. Piesco "from two meetings with Commissioners from other agencies." *Id.* at 1153. Moreover, eight days after Dr. Piesco commenced a section 1983 action against the *Piesco* defendants, the *Piesco* defendants fired her. The *Piesco* defendants presented no evidence to the Court that Dr. Piesco's testimony to the Senate Committee "either interfered with DOP's efficient functioning or impeded the proper performance of [Dr. Piesco's] daily duties." *Id.* at 1159.

In balancing the interests of DOP and Piesco, as is required by *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Second Circuit emphasized that Dr. Piesco's testimony had to be accorded significant weight in the *Pickering* balance because "speech critical of the government is precisely the kind of speech that the first amendment was designed to protect." *Piesco,* 933 F.2d at 1157. Citing *Connick v. Meyers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Connick's* progeny, the Second Circuit held that "[w]here the statements involved so clearly touch on matters of public concern, the government is required to demonstrate interference with the efficient functioning of the workplace." *Piesco,* 933 F.2d at 1160. Because the *Piesco* defendants, as noted above, had not demonstrated such interference, the Court held that Dr. Piesco's interest in her testimony "[took] precedence over the City's interest in efficiently performing government services." *Id.* at 1158.

The Court also denied the *Piesco* defendants qualified immunity. *See id.* at 1160–61. The Court emphasized that it was clearly established at the time the *Piesco* defendants retaliated against Dr. Piesco, that retaliation against a public employee because of the employee's criticism of the government was unlawful.[29] *See Id.* at 1161. Moreover, the Court stated that in light of a Department of Investigation Report, that had been released three weeks prior to Dr. Piesco's dismissal and which found that some of the *Piesco* defendants' actions were retaliatory and thus improper, "it [was] incomprehensi-

ble how [the *Piesco* defendants] reasonably could have considered their subsequent discharge of Dr. Piesco to be lawful." *Id.* Thus, *Piesco* clearly held that public employees may not be fired from their jobs in retaliation for speech that substantially. involves matters of public concern and which does not interfere with the efficient functioning of their employers' office.

In the instant case, we have already found that Professor Jeffries' July 20, 1991 speech, which criticized the current educational curricula in this nation's public schools, "substantially involved matters of public concern and 'should be accorded significant weight in the *Pickering* balance.'" *Jeffries v. Harleston,* 820 F.Supp. 741, 743 (S.D.N.Y.1993) (quoting *Piesco,* 933 F.2d at 1157). Moreover, the jury determined that Professor Jeffries' July 20, 1991 speech was a substantial or motivating factor in the defendants' denial to Professor Jeffries of a full three-year term as Chairman of the Black Studies Department, and the jury found that Professor Jeffries' July 20, 1991 speech did not hamper the effective and efficient operation of the Black Studies Department, the College, or the University. *See id.* at 742. After *Piesco,* it should have been apparent to defendants that their actions were unconstitutional. Moreover, we believe that defendants' claims of qualified immunity are especially specious in light of this Court's September 4, 1991 decision in *Levin v. Harleston,* 770 F.Supp. 895 (S.D.N.Y.1991), *aff'd in part, vacated in part,* 966 F.2d 85 (2d Cir.1992), which put defendants on notice that retaliation against a faculty member for out-of-class speech that does not interfere with the functioning of the University is unconstitutional. Thus, we believe that defendants are not entitled to qualified immunity with respect to Professor Jeffries' First Amendment claim.

Defendants contend that they are entitled to qualified immunity with respect to Professor Jeffries' First Amendment claim because it was not clearly established at the time that they denied Professor Jeffries a full three-

---

**29.** Though the Court did not explicitly say so, we assume that the Court meant that at the time the *Piesco* defendants retaliated against Dr. Piesco, it was clearly established that a public employee

may not be fired for speech critical of the government, when the speech has not interfered with the efficient functioning of the employee's workplace.

year term that it is unconstitutional to deny a person a chairmanship, as opposed to a professorship, because of the person's speech. Defendants apparently assert that because a department chairman has greater responsibility than does a professor and because a department chairman is higher up in the academic hierarchy than is a professor, reasonable officials in defendants' positions would not have known that denying Professor Jeffries his Chairmanship would violate his First Amendment rights. We disagree. As noted above, the plaintiff in *Piesco* was head of the Bureau of Examinations, the largest Bureau in DOP, and had a staff that fluctuated between 175 and 200 persons. Dr. Piesco's department was responsible for "the preparation, evaluation, and administration of *all* civil service tests for the City of New York." *Piesco*, 933 F.2d at 1151 (emphasis added); *see also id.* at 1157 (recognizing Dr. Piesco's senior position at DOP). Nevertheless, the Second Circuit held that the *Piesco* defendants violated Dr. Piesco's First Amendment rights.

■ In the instant case, we believe that while important, the responsibilities of a Department Chairperson at City College[30] are not as significant as those of the plaintiff in the *Piesco* case.[31] Moreover, even if the responsibilities of Dr. Piesco and Professor Jeffries could be considered equivalent, the *Piesco* case clearly established that a person's high government position does not give the government license to retaliate against

---

**30.** The CUNY Bylaws describe the duties of a department chairperson as follows:

"Section 9.3 DUTIES OF DEPARTMENT CHAIRPERSON. a. The department chairperson shall be the executive officer of his/her department and shall carry out the department's policies, as well as those of the faculty and the board which are related to it. He/she shall:
1. Be responsible for departmental records.
2. Assign courses to and arrange programs of instructional staff members of the department.
3. Initiate policy and action concerning the recruitment of faculty and other departmental affairs subject to the powers delegated by these bylaws to the staff of the department in regard to educational policy, and to the appropriate departmental committees in the matter of promotions and appointments.
4. Represent the department before the faculty council or faculty senate, the faculty and the board.
5. Preside at meetings of the department.
6. Be responsible for the work of the department's committee on appointments or the department's committee on personnel and budget which he/she chairs.
7. Prepare the tentative departmental budget, subject to the approval by the department's committee on appointments or the department's committee on personnel and budget.
8. Transmit the tentative departmental budget to the president with his/her own recommendations.
9. Arrange for careful observation and guidance of the department's instructional staff members."
Plaintiff's Ex. 26, CUNY Bylaws § 9.3.

**31.** Defendants contend that *Hall v. Ford*, 856 F.2d 255 (D.C.Cir.1988), supports their position that they are entitled to qualified immunity with respect to Professor Jeffries' First Amendment claim. In *Hall*, the University of the District of Columbia ("UDC") fired its Athletic Director for statements he made about possible UDC violations of NCAA and UDC rules. *See id.* at 257. On an appeal from the dismissal of the complaint, the Court of Appeals for the D.C. Circuit held that even though the complaint did not allege that concrete harm had resulted from the statement, the Court could "draw inferences of harm from the employee's speech, his position, and his working relationship with his superior." *Id.* at 261. We believe that *Hall* is inapposite.

First of all, subsequent cases interpreting *Hall* have made clear that *Hall* did not do away with the concrete harm requirement of *Rankin*. These cases have emphasized that *Hall* was decided on a motion to dismiss, and that *Hall* only held that on a motion to dismiss in a *Pickering*-type case a court may draw reasonable inferences of harm from the information contained in the complaint. *See Fire Fighters Ass'n, Dist. of Columbia v. Barry*, 742 F.Supp. 1182, 1191 (D.D.C. 1990) (discussing *Hall*); *Chico Police Officers' Ass'n v. City of Chico*, 232 Cal.App.3d 635, 283 Cal.Rptr. 610, 621 n. 10 (1991) (same). In the instant case, we have had a full trial on the merits, and the jury has made a factual finding that Professor Jeffries' July 20, 1991 speech did not cause any actual harm to the efficient operation of the University.

Moreover, to the extent that *Hall* can be interpreted to stand for the proposition that a defendant need not prove actual harm to the functioning of the government office to justify dismissing a high-level policy-making official because of the official's speech, we believe that *Hall* directly conflicts with *Piesco*. As *Piesco* is a Second Circuit case, we believe, as discussed above, that it was clearly established at the time that defendants denied Professor Jeffries his three-year terms as Chairman of the Black Studies Department, that defendants' actions violated Professor Jeffries' First Amendment rights.

that person for the person's speech.[32] Finally, the fact that Professor Jeffries may have been a spokesperson for his department does not change this analysis since Dr. Piesco, as evidenced by her testimony before the New York State Senate, was a spokesperson for DOP.

Defendants maintain that at the time that defendants denied Professor Jeffries a full three-year term as Chairman, Supreme Court authority, the *Piesco* decision, and other Second Circuit cases established only that a public employee may not be retaliated against for whistleblowing or for testimony that that employee provides to a branch of government. Defendants also contend that Supreme Court authority, the *Piesco* decision, and other Second Circuit cases did not clearly establish at that time that before firing an employee for speech that substantially involves matters of public concern, the government must show that the speech caused actual interference to the efficient functioning of the government office. We believe that defendants read *Piesco*, the Supreme Court authority, and other Second Circuit cases too narrowly.

■ In *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), Rankin, a government employee of a law enforcement agency, was discussing with a colleague the President's policies and said that she hoped that if another assassination attempt were made on the President, the attempt would be successful. *See id.* at 381, 107 S.Ct. at 2895. As a result of Rankin's statement about her hopes regarding a future assassination attempt on the President, McPherson, Rankin's superior, fired Rankin.

*See Id.* at 382, 107 S.Ct. at 2896. The Supreme Court held that because McPherson had failed to show any concrete negative effects of Rankin's statement on the functioning of McPherson's office, McPherson had violated Rankin's First Amendment rights when he fired her because of her statement. *See id.* at 388–89, 392, 107 S.Ct. at 2899, 2901; *id.* at 393 n. *, 107 S.Ct. at 2902 n. * ("[i]n this case, however, there is no objective evidence that [plaintiff's] lone comment had any negative effect on the moral or efficiency of the Constable's office") (Powell, J., concurring).[33] Thus, it is apparent from *Rankin* that in cases where a public employee's speech involves matters of substantial public concern and is not whistleblowing or giving testimony to a branch of government, the government may not fire the employee for the speech unless the government can show that the employee's speech actually interfered with the functioning of the government office. *See Piesco*, 933 F.2d at 1159 (interpreting *Rankin* in the way that we propose).[34]

Moreover, the *Piesco* Court made clear that the First Amendment principles it discussed were not applicable only to whistleblowers or to persons who testify before branches of government. The *Piesco* Court cited the employees' speech in *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), and *American Postal Workers Union v. United States Postal Serv.*, 830 F.2d 294 (D.C.Cir.1987), as examples of the types of speech for which a public employee may not be fired without a showing by the employer that the speech actually interfered with the functioning of the government office. *See Piesco*, 933 F.2d at 1159.

**32.** Of course, as the Second Circuit acknowledged in *Piesco*, the seniority of a public employee's position is a relevant factor for courts to consider in performing the *Pickering* balancing test. *Piesco*, 933 F.2d at 1157. Implicit in our May 11, 1993 Order (*see Jeffries v. Harleston*, 820 F.Supp. 741 (S.D.N.Y.1993)), is our determination that Professor Jeffries' position as Department Chairperson is not enough to tip the scales of the *Pickering* balance in favor of the defendants in this case.

**33.** We recognize that *Rankin* involved an employee whose "duties were purely clerical." *Rankin*, 483 U.S. at 392, 107 S.Ct. at 2901. However, as noted *supra* and *infra*, we believe

that the *Piesco* decision clearly established that the First Amendment principles the Supreme Court announced in *Rankin* apply to high level officials as well.

**34.** The Second Circuit decision in *Piesco* echoed the Supreme Court's holding in *Rankin* concerning the importance of First Amendment protection for statements about issues of substantial public concern. In at least two places, the *Piesco* Court emphasized that speech that is critical of the government is exactly the type of speech that should be accorded greater weight in the *Pickering* balance. *See Piesco*, 933 F.2d at 1157, 1161.

As noted above, the *Rankin* case involved a discussion about the President and his policies. Moreover, the employee's speech in *American Postal Workers* was a letter about the importance of encouraging fellow workers to join a union. Thus, it is clear that the defendant's characterization of *Piesco* as only establishing that a public employee may not be retaliated against for testimony that the employee provides to a branch of government, is incorrect.[35]

▮▮ Defendants contend that Professor Jeffries' comments on who he believed financed the slave trade and built the pyramids, and Professor Jeffries' remarks on how to express the notions of "duality" and "polarity" through a "pyramid analysis" do not deal with matters of substantial public concern. We disagree. Though historically and analytically suspect, these comments revealed what information Professor Jeffries believed should be included in a multicultural curriculum and what mode of analysis he thought should be used in analyzing that information.[36]

▮▮ In their briefs, defendants point out that Professor Jeffries made various remarks in his July 20, 1991 speech that were perceived as anti-semitic and consisted of attacks against a number of individuals. Defendants maintain that because of these re-

marks, reasonable officials in the defendants' positions would not have known that their belief that Professor Jeffries' speech would cause interference with the functioning of the University was not a sufficient basis under the Constitution to deny Professor Jeffries a full three-year term as Chairman of the Black Studies Department. While we recognize that a number of Dr. Jeffries remarks in his July 20, 1991 speech were vulgar, repugnant, and reprehensible, we disagree with defendants' argument.[37] In *Rankin*, the Supreme Court analyzed the employee's controversial statement in the context of the employee's entire conversation with her colleague. *See Rankin*, 483 U.S. at 386–87 & n. 10, 107 S.Ct. at 2897–98 & n. 10. The Court held that because the employee's statement was part of a conversation about the President and his policies, the statement plainly dealt with a matter of public concern. *See Id.* The Court stated that

[t]he inappropriate or controversial character of a statement is irrelevant to the question of whether it deals with a matter of public concern. [D]ebate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. Just as erroneous statements

---

**35.** Defendants also cite *Giacalone v. Abrams* to support their qualified immunity argument. In *Giacalone*, the Second Circuit determined that "the nature of Giacalone's comment suggest[ed] that his First Amendment interests were entitled to comparatively little weight" in the *Pickering* balancing test. *Giacalone v. Abrams*, 850 F.2d 79, 86 (2d Cir.1988). In the instant case, the Court has already determined that the plaintiff's speech touches upon an issue of substantial public concern. Therefore, *Giacalone* is inapposite.

**36.** Defendants cite *Garvie v. Jackson*, 845 F.2d 647 (6th Cir.1988), and *Berg v. Hunter*, 854 F.2d 238 (7th Cir.1988), for the proposition that "the available case law suggests that decisions removing plaintiffs from chairs at academic institutions are generally upheld under the *Pickering* test." Defendants' Memorandum, at 21. We find defendants' argument to be meritless. In *Garvie*, the Court found in favor of the defendants because it determined that the speech at issue was not a matter of public concern. *Garvie*, 845 F.2d at 650–51. In *Berg*, the Court found in favor of

the defendants because the plaintiff's speech caused actual interference with the functioning of the government office. *Berg*, 854 F.2d at 243–44. As is apparent, *Garvie* and *Berg* are inapposite.

**37.** The defendants cite *Mings v. Department of Justice*, 813 F.2d 384 (Fed.Cir.1987), to support their argument that they are entitled to qualified immunity. In *Mings*, the plaintiff was fired for expressing, through internal agency channels, only racist statements and personal grievances about the functioning of the Immigration and Naturalization Service. *See Mings*, 813 F.2d at 387. We believe that *Mings* is inapposite. First of all, the Federal Circuit decided *Mings* before the Supreme Court decided *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), and *Mings* may not survive *Rankin*. Moreover, the speech in *Mings*, when viewed as a whole, is clearly of less public concern than that of Professor Jeffries. Finally, the plaintiff in *Mings* made his statement in a law enforcement context, and therefore he was entitled to less First Amendment protection than public employees in non-law enforcement agencies. *See*

must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected.

*Id.* at 387, 107 S.Ct. at 2898–99 (quotation marks and internal citations omitted). We believe that *Rankin* clearly established that caustic statements that are *related to* and are made in the context of a speech which discusses an issue of substantial public concern, must also be considered statements about an issue of substantial public concern.[38]

In the instant case, Professor Jeffries made many of his personal attacks in the context of discussing those people who disa-

*McMullen v. Carson*, 754 F.2d 936, 939–40 (11th Cir.1985).

**38.** We agree with the D.C. Circuit's assertion that *Rankin* does not stand for the proposition that,

> any statement "dropped" into the middle of a discussion on a matter of public concern [is considered itself a matter of public concern].... *Rankin* appears to require that the speech for which the public employee has been disciplined must be "related" or "connected" to the speech on a matter of public concern in order for the contextual justification to apply to the *Pickering* formula. We need not define the precise outer boundaries of this "relatedness" because, whatever its limits, the *Rankin* precedent shows conclusively that [Professor Jeffries'] speech falls well within those boundaries.

*American Postal Workers Union v. United States Postal Serv.*, 830 F.2d 294, 303 n. 8 (D.C.Cir. 1987).

**39.** The defendants argue that *Dartland v. Metropolitan Dade County*, 866 F.2d 1321 (11th Cir. 1989), supports their contention that at the time defendants denied Professor Jeffries a full three-year term as Chairman of the Black Studies Department, it was not clearly established that a public employee who makes a speech which contains personal attacks against the employee's superiors can only be fired because of the speech if the speech causes actual harm to the functioning of the government office. We disagree. In *Dartland*, the plaintiff's statement primarily involved personal complaints about how the plaintiff's supervisor managed the plaintiff's position, and thus the statement was of limited public concern. *See Dartland*, 866 F.2d at 1322 (the plaintiff told a reporter that his superior was a "paid lackey" who had a "total misconception of what [the plaintiff] does"). By contrast, we have found that Professor Jeffries' speech discusses the state of the American educational system—a matter of substantial public concern. Thus, *Dartland* is inapposite.

greed with his position on a multicultural curriculum in the New York State public schools.[39] Moreover, Professor Jeffries' description of Dr. Bernard Sohmer as the "head Jew at City College" and Professor Jeffries' reference to discussions he had with "[his] Jews at city college" came in the context of Dr. Jeffries' description of his conversations with Jewish members of the City College faculty about the alleged role of Jews in the slave trade. Because Professor Jeffries' caustic remarks are clearly related to his speech as a whole, we believe that reasonable officials in defendants' positions should have known that Dr. Jeffries' entire speech was protected.[40]

**40.** Defendants cite *McMullen v. Carson*, 754 F.2d 936, 937 (11th Cir.1985), to support their position that it was not clearly established at the time defendants denied Professor Jeffries a full three-year term as Chairman of the Black Studies Department that actual hampering of the effective operation of a government agency must be shown to justify the government's firing of an employee because of the employee's speech containing racist statements. We disagree.

In *McMullen*, the defendant Sheriff fired the plaintiff, an employee in the Sheriff's department, after the plaintiff had appeared on television identifying himself as both a Klan recruiter and an employee of the Sheriff's office. *See id.* at 937. The Court held that the Sheriff did not violate the plaintiff's First Amendment rights even though the Court found no actual disruption of the effective operation of the Sheriff's department. *McMullen* 754 F.2d at 940. There was, however, evidence in the record of a serious backlash from the community immediately after the television interview and prior to plaintiff's dismissal. *See id.*

The Court in *McMullen* explicitly limited its holding to employees of law enforcement agencies. *See id.* at 938 ("the ... critical factor here is that plaintiff was employed by a law enforcement agency, the members of which are subject to greater First Amendment restraints than most other citizens"). The Court then emphasized that public confidence in the Sheriff's department is essential to the department's ability to keep the peace. *See id.* at 940 ("We hold only that a law enforcement agency does not violate the First Amendment by discharging an employee whose active participation in an organization with a history of violent activity, which is antithetical to enforcement of the laws by state officers, has become known to the public and created an understandably adverse public reaction that seriously and dangerously threatens to cripple the ability of the law enforcement agency to perform effectively its public duties."). Thus, we

In sum, we believe that defendants are not entitled to qualified immunity on Professor Jeffries' First Amendment claim.[41]

## D. Punitive Damages:

■ Defendants maintain that the punitive damage awards ($30,000 against President Harleston, $50,000 against Chancellor Reynolds, and $80,000 against each of the four Trustees) are excessive. We observe that the Court has already set aside the plaintiff's Fourteenth Amendment claim. As one out of two of the claims against President Harleston and Chancellor Reynolds has been dismissed, the Court believes that a fifty percent reduction in the punitive damage awards against these two defendants is appropriate. Accordingly, we reduce the punitive damage award against President Harleston from $30,000 to $15,000 and the award against Chancellor Reynolds from $50,000 to $25,000.

■ An award of punitive damages should be set aside when it shocks the judicial conscience (see Hughes v. Patrolmen's Benevolent Ass'n of New York, Inc., 850 F.2d 876, 883 (2d Cir.), cert. denied, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988), citing Zarcone v. Perry, 572 F.2d 52, 56 (2d Cir. 1978)), or when it is not reasonably calibrated to a defendant's financial circumstances. See Smith v. Lightning Bolt Products, Inc., 861 F.2d 363, 373 (2d Cir.1988).

We observe that the defendants were put on notice by the Levin v. Harleston decision that retaliation against a faculty member for exercise of his or her free speech rights, in the absence of any actual interference in the functioning of the University, is prohibited by law. See Levin v. Harleston, 770 F.Supp. 895, 921–22 (S.D.N.Y.1991), aff'd in part, vacated in part, 966 F.2d 85 (2d Cir.1992). Despite this notice, the defendants proceeded to retaliate against Professor Jeffries for his speech outside the University. Under these circumstances, we do not find that the puni-

tive damage awards against the defendants shock the judicial conscience.

Defendants cite Piesco v. City of New York, 1993 W.L. 37100 (S.D.N.Y.1993), in which a jury awarded punitive damages of $50,000 against each of two defendants, to a city employee who had been fired for giving sworn testimony about examination standards in the Police Department to a legislative committee. The Court believes that the gravity of the defendants' actions in this case is at least as serious as the gravity of the defendants' actions in Piesco, especially in light of the fact that in this case, the Levin v. Harleston decision put defendants on notice. We believe that the difference between the $50,000 awarded against each of the Piesco defendants and the $80,000 awarded against each of the four Trustees is reasonable under the circumstances. Accordingly, the Court declines to reduce the awards. We also find that in view of the $50,000 award against each of the Piesco defendants, the $15,000 award against President Harleston and the $25,000 award against Chancellor Reynolds do not shock the judicial conscience.

■ In addition, in view of the fact that the defendants presented no evidence as to their financial circumstances, we will not overturn the award on the grounds of financial hardship to the defendants. See Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir.1992). See also Zarcone v. Perry, 572 F.2d at 56 ("... the decided cases and sound principle require that a defendant carry the burden of showing his modest means—facts peculiarly within his power—if he wants this considered in mitigation of damages."); Smith v. Lightning Bolt Prods., Inc. ("... it is the defendant's burden to show that his financial circumstances warrant a limitation of the award." 861 F.2d at 373, citing Zarcone v. Perry ).

Accordingly, the Court cuts in half the punitive damage awards against President Harleston and Chancellor Reynolds, but finds that the punitive damage awards

---

believe that McMullen is distinguishable from the instant case and is inapposite.

**41.** Because we have dismissed plaintiff's Fourteenth Amendment claim, we need not analyze defendants' Fourteenth Amendment qualified im-

munity arguments. Moreover, even if our determination that plaintiff's Fourteenth Amendment claims must be dismissed is erroneous, we hold that defendants are entitled to qualified immunity on this claim.

against each of the four Trustees is not excessive.

### E. Permanent Injunction—Reinstatement:

■ We now address the most troubling and nettlesome aspect of this case, the return of Professor Jeffries to the Chairmanship. To justify permanent injunctive relief from a constitutional violation, a plaintiff must establish three elements: the fact of the constitutional violation, the presence of continuing irreparable injury if the relief is not granted, and the lack of an adequate remedy at law. *See Levin v. Harleston,* 770 F.Supp. 895, 918 (S.D.N.Y.1991), *aff'd in part, vacated in part,* 966 F.2d 85 (2d Cir.1992). *See also New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 57, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975); *Farmland Dairies v. McGuire,* 789 F.Supp. 1243, 1250 (S.D.N.Y.1992); *Rosenberg v. Meese,* 622 F.Supp. 1451, 1476 (S.D.N.Y.1985). The jury

and the Court have already determined the fact of the constitutional violation.

■ The plaintiff maintains that the denial of his full three-year term as Chairman of the Black Studies Department constitutes irreparable injury. The Chairmanship of the Black Studies Department at City University carries with it a prestige both within and outside the University. In addition, the Chairmanship gives its holder a significant degree of power and influence over the policies and direction of the Black Studies Department. The denial of Professor Jeffries' full three-year term as Chairman of the Black Studies Department constitutes a loss to the plaintiff of this prestige and power associated with the office. We believe this loss constitutes irreparable harm to the plaintiff.[42] Furthermore, plaintiff appears to have no adequate remedy at law.[43] The future prospect of one day being reelected to the Chair is no adequate remedy to Professor Jeffries,[44] and does not eliminate

**42.** The Court observes that the Department Chair of the Black Studies Department receives no monetary compensation. Presumably, the power and prestige that accompany the position compensate for the extra responsibilities. *See Ezekwo v. NYC Health & Hosps. Corp.,* 940 F.2d 775, 783 (2d Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). The Court believes that this power and prestige is not capable of reliable calculation in terms of a damage figure. Moreover, we believe that the lack of monetary compensation for the position of Department Chair is a recognition by the University that the attributes of the office are valuable in and of themselves, irreparable that are not easily transferrable into a monetary figure. These facts support the plaintiff's position that the denial of his full three-year term constitutes irreparable harm to plaintiff. As the Court pointed out in *Gulf & Western Corp. v. Craftique Prods., Inc.,* 523 F.Supp. 603 (S.D.N.Y.1981), "the Second Circuit has recognized that even in situations where damages are available, irreparable harm may be found if damages are *'clearly difficult to assess and measure.'"* *Id.* at 607, *citing Danielson v. Local 275, Laborers Int'l Union of North America,* 479 F.2d 1033, 1037 (2d Cir.1973). We observe that the punitive damages awarded in this case do not represent either compensation for or a measure of the injury suffered.

**43.** *See Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70 (2d Cir.1979) ("irreparable injury means injury for which a monetary award can-

not be adequate compensation ..." *Id.* at 72); *Gulf & Western Corp. v. Craftique Prods., Inc.,* 523 F.Supp. at 607 ("If the injury complained of may be compensated by an award of monetary damages, then an adequate remedy at law exists and no irreparable injury may be found as a matter of law.").

**44.** Defendants seem to argue that plaintiff was not irreparably injured because he can seek the Chairmanship of the Black Studies Department at the next election. *See* "Defendants' Supplementary Memorandum of Law in Opposition to Plaintiff's Application for Injunctive Relief," July 9, 1993, at 5. Indeed, Professor Jeffries can seek the position of Chairman at the next election. In the meantime, however, the constitutional violations of Professor Jeffries' rights and the accompanying injury will continue if the Court does not reinstate the plaintiff to the position of Chairman of the Department. The Court will not allow the injury to Professor Jeffries to continue pending a new election, when Professor Jeffries has already won a valid election but was unconstitutionally denied his right to serve out his three-year term.

The defendants further maintain that if Professor Jeffries is reinstated as Chairman of the Black Studies Department, it should only be for a period of one year. *See* Defendants' "Memorandum of Law in Reply to Plaintiff's Opposing Memorandum and in Further Support of Defendants' Motion for Judgment as a Matter of Law, or, in the Alternative, a New Trial, and Further Opposition to Plaintiff's Request for Injunctive

the irreparable harm to plaintiff.[45]

We now turn to the matter of balancing the equities. Defendants correctly point out that courts in this Circuit have considered "the balance of equities" in determining whether to award a permanent injunction. *See Automotive Elec. Serv. Corp. v. Association of Automotive Aftermarket Distrib.*, 747 F.Supp. 1483, 1513 (E.D.N.Y. 1990) ("the balance of equities must tip decidedly in favor of the plaintiff [seeking permanent injunctive relief]. . . ."). *See also Town of Huntington v. Marsh*, 884 F.2d 648, 654 (2d Cir.1989), *cert. denied*, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *Travellers Intern. AG v. Trans World Airlines, Inc.*, 722 F.Supp. 1087, 1096 (S.D.N.Y.1989). Defendants maintain that the equities tip in their favor, because plaintiff's reinstatement would "jeopardize the needs of the Department and its students . . ." Defendants' Memorandum, at 52. Moreover, defendants allege, "plaintiff does not grasp the sensitivities and sensibilities essential for working in an ethnically diverse environment which has established policies intended to bridge, rather than exacerbate, relations between different ethnic and religious groups." *Id.* at 57.

Defendants again cite to the aforementioned four incidents that are said to demonstrate plaintiff's "disruptive and damaging" behavior. *Id.* at 58.[46] The Court views the

incident with Elliot Morgan, a student reporter from the *Harvard Crimson*, as the most substantial and disturbing of these incidents, particularly in light of the fact that plaintiff did not seek to challenge in Court the veracity of Mr. Morgan's testimony. The professor's behavior can fairly be described as thuggish, and incompatible with the civilized discourse and conduct expected of tenured professors. However, we do not find that this incident, and the three others, taken as a whole, rise to a level that would justify denying plaintiff injunctive relief. Furthermore, even though the jury's verdict does not bind the Court on the equities question, we note that the jury gave little if any weight to these incidents, including the Morgan affair. In considering the record in this case, we find that the equities tip in favor of the plaintiff, whose first amendment rights were unconstitutionally violated by defendants, and whose injury will continue until he is restored as Chairman of the Department.

The Court declines to enter a debate on the relative qualifications of Professor Gordon versus Professor Jeffries or between the merits of their different approaches to Black Studies. The defendants seem to request that this Court use its broad equitable powers to decide the question of who would

---

Relief" ("Defendants' Reply Memorandum"), June 14, 1993, at 21. The defendants reason that if Professor Jeffries had not been denied his full three-year term, his term would have expired in one year. The plaintiff, however, was denied the two years remaining in his term, and will be made whole only if he is allowed to serve as Chairman for the full two years that he was denied by the defendants' unconstitutional actions. Accordingly, the Court reinstates Professor Jeffries as Chairman of the Black Studies Department for a full two years.

**45.** Plaintiff also maintains that defendants' actions created a "chilling effect" on plaintiff's First Amendment rights, discouraging and deterring the plaintiff from speaking freely out of fear of further sanction. *See* "Plaintiff's Reply Memorandum," June 14, 1993, at 4 ("After the uncertainty following Defendants' actions, he was inhibited and certainly, following the March 23, 1991 action by the Trustees, there is little evidence that his speech was as wide ranging as

before."). Such a chilling effect would certainly constitute irreparable injury supporting injunctive relief. *See Levin v. Harleston*, 966 F.2d at 89 ("It is settled that governmental action which falls short of a direct prohibition on speech may violate the First Amendment by chilling the free exercise of speech" *Id.*); *Ostrowski v. Local 1–2, Utility Workers Union of America, AFL–CIO*, 530 F.Supp. 208 (S.D.N.Y.1980) ("a showing of a 'chilling effect' on plaintiffs' exercise of First Amendment rights is adequate to support injunctive relief." *Id.* at 215). However, the plaintiff presented no evidence at trial that defendants' denial of his full three-year term has created a chilling effect on plaintiff's speech. There is insufficient evidence in the record that plaintiff faced any further sanction as a result of his speech, and insufficient evidence that Professor Jeffries toned down his speeches following the denial of his full three-year term.

**46.** For a description of the four incidents, see pages 1075–76 of this Opinion.

make a better Chairman. *See* Defendants' Memorandum, at 51–52; Defendants' Reply Memorandum, at 24–25. Such a decision is not the province of the federal court. Nor was it the subject of the trial.[47] Defendants and City University bear the responsibility for and the freedom of making employment decisions with respect to Department Chairpersons. However, they may not base their decisions on unconstitutional grounds, as they have in the case of Professor Jeffries. Nor may they evade their responsibilities by seeking arbitration in federal court between competing candidates.

Defendants maintain that "the harm that would be done to Professor Gordon should also be weighed against any benefit accruing to the plaintiff." Defendants' Memorandum, at 58. We observe that the reinstatement of Professor Jeffries in no way reflects upon the significant and substantial accomplishments of Professor Gordon in his field, but only reflects upon the irresponsibility of the defendants who made the decision to deny plaintiff his full three-year term on unconstitutional grounds. The Court regrets any inconvenience or hardship to Professor Gordon who apparently had planned on remaining Chairman for one more year.

■ Plaintiff has requested injunctive relief sufficiently broad to prevent defendants from creating "shadow sections" (a reference to this Court's decision in the *Levin* case) or their equivalent, including an Institute of Black Studies. *See* Plaintiff's Reply Memorandum, at 9–10. There is, however, insufficient evidence with respect to the defendants' threatened actions and their motives and in-

tentions.[48] Accordingly, the Court declines to award such relief.

Plaintiff also requests that this Court "spell out in full detail the injunctive relief provided to the Plaintiff." Plaintiff's Reply Memorandum, at 9–10. According to plaintiff,

> [t]he requested language is intended to prevent Defendants from employing any ruse to undermine Plaintiff's position and authority as Chair and is intended to secure for the Plaintiff the same protection this Court provided Professor Levin when it recognized and prohibited the effects of the shadow classes established by Defendants in response to Levin's protected speech.

*Id.* at 9. The Court declines to grant the requested relief. In contrast to the *Levin* case, plaintiff here has presented insufficient evidence upon which to grant broad equitable relief, in effect enjoining the defendants from committing acts which are wholly speculative and upon which no adequate record was made.

■ Defendants argue that this Court should deny plaintiff equitable relief because plaintiff "has unreasonably delayed in asserting its rights." Defendants' Memorandum, at 60. Defendants maintain that this delay evinces a lack of interest on the part of plaintiff in regaining his position as Chairman of the Black Studies Department. *Id.* The Court observes that the delay in question, between March 20, 1992 (when plaintiff learned that he would not be able to serve out his full three-year term), and June 5,

---

**47.** Moreover, the Court will not allow defendants to rehash arguments that failed at trial. The jury found, and the Court agreed, that plaintiff's July 20, 1991 speech was a substantial or motivating factor in the denial of plaintiff's three-year term as Chairman of the Black Studies Department. Despite this finding, the defendants, in their papers, attempt to relitigate this factual issue before the Court. The Court declines to do so.

**48.** In *Levin v. Harleston,* there was overwhelming evidence presented at trial concerning the creation of shadow sections. *See Levin v. Harleston,* 770 F.Supp. at 907–910. In contrast, in this case, there was little evidence at trial concerning the creation of shadow sections, and the circumstances surrounding the creation of the Institute are in dispute. While plaintiff maintains that the

Institute is an attempt by defendants to "drain and divert resources from the Black Studies Department and thereby undermine the authority and effectiveness of Plaintiff as Chair ..." (Plaintiff's Reply Memorandum, at 10), the defendants maintain that the Institute "predated this trial and [is] ... neither a response to the verdict in this action nor a stratagem to evade its impact" ("Defendants' Memorandum of Law in Opposition to Plaintiff's Application for Injunctive Relief," June 16, 1993, at 7). *See* Roy P. Moskowitz "Affidavit in Opposition to Plaintiff's Request for Injunctive Relief," June 7, 1993. There is insufficient evidence for the Court to discern the motivations of defendants with respect to the Institute.

1992 (when plaintiff commenced this lawsuit), is only two-and-a-half months. We do not believe that this time period represents in any way an unreasonable delay on the part of plaintiff. Nor does the Court believe that plaintiff's conduct has in any way unreasonably delayed a trial on the merits.

In addition, defendants maintain that plaintiff is not entitled to equitable relief because he comes to the Court with "unclean hands." *Id.* at 61. In support of this argument, the defendants cite to the four incidents mentioned above, in which plaintiff allegedly displayed "grossly inappropriate and irresponsible behavior." *Id.* at 56. The defendants also point out that plaintiff has yet to apologize to the alleged victims of the incidents. The Court does not believe that the four incidents or the lack of apologies rise to a level implicating the doctrine of "unclean hands." *See Playboy Enters., Inc. v. Chuckleberry Publishing, Inc.,* 486 F.Supp. 414, 435 (S.D.N.Y.1980) ("... the 'unclean hands' doctrine is ... a limited device, invoked by a court only when a plaintiff otherwise entitled to relief has acted so improperly with respect to the controversy at bar that the public interest in punishing the plaintiff outweighs the need to prevent defendant's tortious conduct."); *Markel v. Scovill Mfg. Co.,* 471 F.Supp. 1244 (W.D.N.Y.) ("... the courts are reluctant to apply the unclean hands doctrine in all but the most egregious situations. It will be applied only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Id.* at 1255), *aff'd,* 610 F.Supp. 807 (2d Cir.1979) (quotes and citations omitted).

The Court is not unmindful of the egregiously offensive and destructive nature of Professor Jeffries' statements, and the widespread dismay and alarm that they have evoked. But we as a society cannot enjoy the freedoms of the First Amendment without paying the costs and enduring the burdens of such liberty. Chief among these costs is the fact that a category of viewpoints that a large majority in this nation consider morally reprehensible and racist are also protected by the First Amendment. In this case, the derogatory comments of Professor Jeffries with respect to specific ethnic groups would seem to come within the compass of that category. *See Collin v. Smith,* 578 F.2d 1197 (7th Cir.), *cert. denied,* 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978) (First Amendment protects right of Nazi party to march through predominantly Jewish town containing many Holocaust survivors); *Brandenberg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (First Amendment protects right of Ku Klux Klan leader to make derogatory remarks against Jews and blacks); *Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (First Amendment protects right of person to burn U.S. flag during protest rally). We are therefore constrained to rule that Professor Jeffries' statements, when spoken outside the classroom, remain under the umbrella of constitutional protection, as long as those statements do not impede the efficient and effective operation of the College or University.

Accordingly, the defendants are required to reinstate the plaintiff as Chairman of the Black Studies Department, for a period of two years effective immediately.

We now turn to the limitations of the injunction with respect to the rights of the University in dealing with any future misconduct by Professor Jeffries. In awarding plaintiff permanent injunctive relief, the Court does not constrain the defendants from removing Professor Jeffries for good cause.[49] The Black Studies Department is not, after all, the personal property or the political fiefdom of plaintiff, and plaintiff's reinstatement is not a permanent license for the plaintiff to hold the position of Chairman of the Black Studies Department or, indeed, it must be emphasized, to hold the position of a tenured professor at CUNY. The defendants retain the full and unqualified right and the responsibility to discipline the plaintiff in response to improprieties or behavior deemed unworthy of a Department Chair or

---

**49.** Good cause might, for example, be incompetence on the part of plaintiff in his classroom teaching, or failure to adequately perform his duties as Chairman in a manner consistent with his obligations under the CUNY Bylaws.

a tenured professor, as long as in so doing the defendants do not violate the United States Constitution. Indeed, there appears to have been some indication, regrettably not developed at the trial, of rather serious improprieties on the part of Professor Jeffries upon which the CUNY administrators could have constitutionally acted.[50] For the most part, however, the University inexplicably and perhaps cowardly, chose to ignore these improprieties, and only acted against the plaintiff when the public outrage over the July 20, 1991 speech in effect forced its hand. We observe, regrettably but necessarily, that the students of CUNY and the people of New York State are entitled to a higher standard of decision-making on the part of its public officials.

We again emphasize that this Order does not preclude the defendants from disciplining Professor Jeffries in response to behavior in class that is deemed incompatible with his duties and with the mission and values of the University. Of course, the United States Constitution broadly protects academic freedom. As Justice Brennan wrote in *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967):

> ... the First Amendment ... does not tolerate laws that cast a pall of orthodoxy over the classroom.... The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, [rather] than through any kind of authoritative selection.

*Id.* at 603, 87 S.Ct. at 683 (quotation marks and citations omitted). The protection of academic diversity with respect to ideas, perspectives, and their messengers is a vital concern of the Constitution. *See Dube v. State Univ.,* 900 F.2d at 597–98.

However, the Constitution does not prevent a University from taking disciplinary action against a professor who engages in a systematic pattern of racist, anti-semitic, sexist, and homophobic remarks during class.[51] *See Bishop v. Aronov,* 926 F.2d 1066, 1071–72 (11th Cir.1991); *see also Martin v. Parrish,* 805 F.2d 583 (5th Cir.1986) (professor's in class abusive behavior toward students, as well as "[i]ndecent language and profanity [in class] may be regulated in the schools ..." *Id.* at 585).[52] Such a pattern tends to silence rather than promote the free exchange of ideas, and to destroy rather than enhance academic diversity. Nor does the Constitution protect the right of a professor to teach patently absurd and wholly fallacious theories in class.[53] There is some limited evidence in the record that Professor Jeffries has engaged in both of these activities. *See* Defendants' Exhibit F, Letter from Margaret Murphy to Dean Rosen, dated April 1, 1991 (student requests refund of tuition for dropped course; student dropped course in response to inadequate performance of professors, including Professor Jeffries, who among other things, "spouted the most racist line of nonsense," and "sprinkled his lectures with gratuitous sexual references."); Defendants' Exhibit H, Memorandum from Morris Silberberg to President Harleston, dated September 15, 1988 (attached articles by a student describe theories espoused by Professor Jeffries in class, including theory that

50. For example, as far back as November of 1984, Professor Jeffries made anti-semitic and racist remarks to a candidate interviewing for the position of director of the College's International Studies Program. As a result of the remarks, the candidate withdrew from consideration. In the face of what seems to be totally unacceptable behavior for a Department Chair, the CUNY administrators allowed Professor Jeffries to retain his Chairmanship, only sending him a letter of reprimand. *See* Defendants' Exhibit I, "Report of Inquiry Regarding Allegations Made by Mitchell A. Seligson," dated February 12, 1985; Defendants' Exhibit J, Letter from President Harleston to Professor Jeffries, dated

March 8, 1984; Defendants' Exhibit K, Memorandum from President Harleston to Provost Lustig, *et al.,* dated March 8, 1985.

51. This list is not exhaustive.

52. *Cf. R.A.V. v. City of St. Paul,* —— U.S. ——, 112 S.Ct. 2538, 2546, 120 L.Ed.2d 305 (1992) (First Amendment doesn't protect "sexually derogatory 'fighting words'" in employment context.).

53. For example, the First Amendment would not protect the right of a geography professor to teach in class that the earth is flat.

white people are genetically inferior "ice" people, and black people are "sun" people). This Order does not require City University to continue to disserve its own students by subjecting them in class to the bigoted statements and absurd theories of any of its professors.

Nevertheless, in his capacity as Chairman of the Department, Professor Jeffries is entitled to the constitutional protection that surrounds his speech and professional activities. While there may have been compelling and legitimate grounds upon which to discipline Professor Jeffries, the University chose to act upon illegitimate and unconstitutional grounds, specifically upon the plaintiff's off-campus July 20, 1991 speech and the publicity surrounding it. Accordingly, the Court found that the defendants violated the first amendment rights of the plaintiff.

### Conclusion

The Court grants defendants' motion to set aside, vacate, and overturn the jury verdict on plaintiff's second claim based upon the Fourteenth Amendment, dismisses that claim as a matter of law, and directs the Clerk of the Court to enter judgment on that claim in favor of the defendants. The defendants' motions with respect to the jury's verdict on the First Amendment claim, the defense of qualified immunity, and the punitive damage award are denied, except that the award against defendant Harleston is reduced from $30,000 to $15,000, and the award against defendant Reynolds is reduced from $50,000 to $25,000. The defendants are hereby mandatorily enjoined to immediately reinstate the plaintiff to the Chairmanship of the Black Studies Department of City College of the City University of New York for a period of two years effective immediately. This injunction explicitly permits the defendants and appropriate officials of City University to initiate removal proceedings with respect to plaintiff's Chairmanship or tenured faculty position for any future conduct that is outside the ambit of constitutional protection as enunciated in this Opinion.

SO ORDERED.